**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 12, 2011

Lyle W. Cayce
Clerk

No. 10-20621

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES A. BROWN,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, SOUTHWICK, and GRAVES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

James Brown challenges his convictions on the ground that the government violated his right to due process by withholding materially favorable evidence that it possessed pre-trial. *See Brady v. Maryland*, 373 U.S. 83 (1963). Because the district court did not clearly err in holding that the evidence was not material, we affirm.

No. 10-20621

I.

This appeal arises from an earlier trial relating to the Enron scandal. *See United States v. Brown* (*Brown I*), 459 F.3d 509, 513 (5th Cir. 2006). At years' end 1999, Merrill Lynch purchased an equity interest in three barge-mounted power generators off the Nigerian coast from Enron Corporation ("Enron") for $28 million, with Merrill Lynch paying Enron $7 million and Enron loaning Merrill Lynch the balance. Enron booked a roughly $12 million profit on the transaction. The government contended that the sale was a sham whose sole purpose was to allow Enron artificially to enhance its fourth-quarter earnings to meet forecasts. According to the government, the transaction was not a true sale, because Enron did not actually sell a stake in the barges but instead secretly promised that a company run by Andrew Fastow, Enron's CFO, would buy back the stake in the barges from Merrill Lynch within six months for a guaranteed 15% return plus a $250,000 "advisory fee." In other words, the government alleged Enron just loaned out the stake in the barges to Merrill Lynch, risk-free and with a guaranteed return, but made it seem like a sale so that it could book a pretend profit.

Brown was a managing director at Merrill Lynch and the head of its Strategic Asset and Lease Finance group at the time of the transaction. He testified to a grand jury that, to his knowledge, Enron had never promised that it would buy back Merrill Lynch's equity in the barges within six months of the purported sale.

The government indicted Brown, charging him with, as relevant here, perjury and obstruction of justice, alleging that Enron executives orally guaranteed to repurchase Merrill Lynch's equity stake in the barges, and Brown knowingly lied to the grand jury about his understanding of the transaction.[1] Specifically,

---

[1] Brown, along with five co-defendants, was also charged in the same indictment with

(continued...)

No. 10-20621

the indictment quoted the following testimony and alleged that the underlined

portions were false:

> Q. Do you have any understanding of why Enron would believe it
> was obligated to Merrill to get them out of the deal on or before
> June 30th?
> . . . .
> A. It's inconsistent with my understanding of what the transaction
> was.
> . . . .
>    Again, do you have any information as to a promise to Merrill
> Lynch that it would be taken out by sale to another investor by June
> 2000?
> A. In—no, I don't—the short answer is no, I'm not aware of the
> promise. I'm aware of a discussion between Merrill Lynch and
> Enron on or around the time of the transaction, and I did not think
> it was a promise though.
> Q. So you don't have any understanding as to why there would be
> a reference to a promise that Merrill would be taken out by sale to
> another investor by June of 2000?
> A. No.

Also relevant is the following testimony elaborating on Brown's under-

standing of the transaction:

> Q. And let me now direct your attention to the to the [sic] para-
> graph of the Nigerian barge project. Now, do you see where it says
> in the second-to-last line, "[Merrill Lynch] was supportive based on
> Enron relationship [sic], approximately $40 million in annual reven-
> ues, and assurances from Enron management that we will be taken
> out of our $7 million investment within the next three to six
> months." Does that accord with your understanding of the transac-
> tion?

---

¹ (...continued)

conspiracy and wire fraud. The jury found him guilty on those counts, but we reversed
because the government had relied on an improper "honest services" theory of fraud. *Brown I*,
459 F.3d at 513. We later held that the government could retry Brown on the conspiracy and
wire fraud counts without violating his right against double jeopardy, *United States v. Brown*
(*Brown II*), 571 F.3d 492, 499 (5th Cir.), *cert. denied*, 130 S. Ct. 767 (2009), but the government
ultimately elected not to pursue those charges, and the district court dismissed them with pre-
judice. So only Brown's perjury and obstruction of justice charges remain.

A. No. I thought we had received comfort from Enron that we would be taken out of the transaction within six months or would get that comfort. If assurance is synonymous with guarantee, that is not my understanding. If assurance is interpreted to be more along the lines of strong comfort or use best efforts, that is my understanding.

We summarize the detailed evidence presented at trial relating to the perjury and obstruction-of-justice charges: On December 22, 1999, Merrill Lynch employee Tina Trinkle participated in a conference call (the "Trinkle call") that included Brown. Trinkle testified that, during the call, "[s]omebody at Enron" promised Merrill Lynch that the Nigerian barges would be bought back, and a Merrill Lynch executive (possibly Brown himself; Trinkle was not sure) rejected putting that guarantee in writing, because it would not allow "the right accounting treatment." Merrill Lynch employees asserted during the call that someone at Enron—they did not say who—had given them "his word" and "his strongest verbal assurances" of a buyback. No lawyers participated in the call.

Trinkle said Brown "was very negative on the deal, and he felt that it had a lot of risks."[2] For example, Trinkle said Brown was concerned about the "political risk" involved in the transaction (because the barges were in Nigeria). Brown's notes also indicate that he was concerned about the "reputational risk" of "aid[ing]/abet[ting] Enron income stmt. manipulation," and he communicated those concerns to Bill Fuhs, a vice-president working under him.

Katherine Zrike, chief counsel for Merrill Lynch's investment banking division, said Bob Furst, a managing director at Merrill Lynch and the investment banker responsible for the Enron account, told her, before the Trinkle call, that "the only agreement between Enron and Merrill Lynch was that Enron would help Merrill Lynch re-market the barges," that is, do its best to find a third party

---

[2] Similarly, Bill Fuhs, a vice-president working under Brown, testified that "I think [Brown] thought it was a very risky transaction. I don't think he liked the transaction."

No. 10-20621

to purchase them from Merrill Lynch.  Indeed, a memorandum dated the day before the Trinkle call and sent from Furst to Brown said, "Enron is viewing this transaction as a bridge to permanent equity and *they believe* our hold will be for less than six months."  (Emphasis added.)

After the Trinkle call, that same day, Zrike convened a meeting of Merrill Lynch's Debt Markets Commitment Committee ("DMCC"), in which Brown participated, at which "everybody was agreeing" that there could not be a buyback of Merrill Lynch's equity interest in the barges, because that would not permit Enron legally to account for the transfer of the barges to Merrill Lynch as a sale.  Furst stated at the meeting that the "'real agreement with Enron is only to re-market.'"  The DMCC did not approve the transaction but instead opted to have Dan Bayly, head of investment banking at Merrill Lynch, and his boss, Tom Davis, review it for approval or rejection.

Shortly thereafter, Zrike, Bayly, and others (but not Brown) met with Davis in Davis' conference room, where the deal was explained to Davis.  Zrike said they "talked about the fact that this needed to be a true sale and, therefore, all risks of loss and all risks associated with owning the barge would pass to Merrill Lynch for the time that it owned the barges."  Zrike mentioned the risks of dealing with a property located in Nigeria, and there was a discussion about the fact that there had been no due diligence on the barges.  Davis ultimately approved the deal, although he was "not happy" about it.

Brown went on vacation the day after the Trinkle call and DMCC meeting.[3]  That day, Fastow conducted a conference call with Merrill Lynch that did not include Brown or Merrill Lynch's chief counsel, Zrike.  No one who partici-

---

[3] Brown says he received only one call relating to the barges while on vacation, and it concerned only where to domicile the special purpose entity that would be created to hold Merrill Lynch's interest in the barges.  But he also says he did not return from vacation until January 2 or 3, even though his signature is on the final engagement letter that was faxed on December 29.

pated in the call testified about its contents, but Eric Boyt, an in-house accountant at Enron, testified that Daniel Boyle, an Enron finance executive who participated in the call, told him right after the call that Fastow had guaranteed a buyback with 15% return in six months if a buyer could not be found. Ben Glisan and Michael Kopper, both high-ranking Enron finance executives, also testified that Fastow and Enron Treasurer Jeff McMahon later told them that they had "promised" Merrill Lynch that they would make sure it was out of the Nigerian barge transaction within six months.

There are also contemporaneous emails from Glisan and James Hughes, another Enron executive, saying, respectively, that, "[t]o be clear, Enron is obligated to get Merrill Lynch out of the deal [by] June 30" and that if "no one will take the Merrill Lynch position, then Enron will inherit it." Finally, there is an unsigned, undated internal Merrill Lynch document from sometime before December 31, 1999, that says that Enron "assured" Merrill Lynch that it "will be taken out of our investment within six months."

The engagement letter itself, which was signed by Brown, makes no mention of a buyback guarantee or a remarketing agreement.[4] An earlier draft of the letter, written by an associate in Brown's department and sent to Fuhs on December 23, 1999 (while Brown was away), says, however, that Merrill Lynch's stake in the barges "will be subsequently sold to third party investors or purchased by Enron or an affiliate" and that Merrill Lynch would receive a 15% annualized return on its investment. Enron executive Boyle struck that language before the final draft.

Sean Long, head of the Enron group that oversaw the Nigerian barge project in Africa, testified that no one at Merrill Lynch "contact[ed] [him] at all with

---

[4] The engagement letter states that Enron is to pay Merrill Lynch a $250,000 "advisory" fee. Brown testified to the grand jury that Merrill Lynch did not actually provide any advisory services to Enron.

No. 10-20621

respect to the barges" between January and June 2000; that is, Merrill Lynch did not follow-up on the barges after it bought them, which indicates that it knew they would be bought back. Long also testified that Boyle had told him "that a senior person at Enron gave assurances to a senior person at Merrill Lynch that they would not get hurt by the transaction."

In June 2000, six months after Merrill Lynch obtained its interest in the barges, LJM2[5]—a partnership that, according to Kopper, was "set up by . . . Fastow, to raise private equity for deals that were to be done with Enron"—purchased Merrill Lynch's equity interest in the barges at a 15% annualized return. Fastow was LJM2's general partner. Kopper testified that "Enron would use LJM as essentially an off-ramp on deals that they needed to use to make earnings for any given quarter." Enron would "warehouse" assets in LJM2 for six months to "misstate" that it had sold them. Kopper referred to "this Nigerian barge deal" as a transaction involving such a misstatement, and

> we knew that we [i.e. LJM2] would only be holding this asset no longer than through year-end and that Enron would get—take us out of that deal. And it wasn't documented; it was just between Andy and senior management of Enron that he [Andy, as general partner of LJM2] would be taken out."

Furthermore, an Enron document, the "Benefits to Enron Summary," dated June 29, 2000, states that "Enron sold barges to Merrill Lynch (ML) in December of 1999, *promising* that Merrill would be taken out by sale to another investor by June, 2000." (Emphasis added).

A couple of emails more directly implicate Brown. After LJM2's purchase of the interest in the barges, Fuhs had an email exchange with Brown in which Fuhs said, "Enjoy the barges on the other side of this trade and good luck." Fuhs was referring to the fact that Brown had an investment in LJM2, which now had

---

[5] In the record and in this opinion, LJM2 is sometimes referred to as LJM.

No. 10-20621

a stake in the barges.  Brown responded, "thanks bill . . . wanna buy a barge?" to which Fuhs replied, "only if I can have a *guaranty* [sic] of make-whole at par + return in case of civil unrest/war."  (Emphasis added).

More significantly, Brown sent an email in March 2001 about an unrelated transaction, saying he would "support an unsecured deal provided we had total verbal assurances from [the company's CEO or CFO]," explaining that "[w]e had a similar precedent with Enron last year, and we had Fastow get on the phone with Bayly and lawyers *and promise to pay us back no matter what*.  Deal was approved and all went well."  (Emphasis added).[6]

In short, there is considerable evidence that Enron executives orally promised Merrill Lynch that it or a third party would buy back the barges within six months.  An email sent by Brown plainly shows his awareness of that promise.  But one can perhaps question, as Brown's attorney did at closing argument and during Brown's original appeal, whether Enron executives really made a "promise" as one might understand it in the commercial context—namely, a binding commitment—or whether it merely meant giving one's not-always-reliable word, what Brown referred to in his grand jury testimony as "strong comfort."[7]

## II.

The jury convicted Brown of perjury and obstruction of justice.  A divided panel affirmed, with Judge DeMoss dissenting on the ground that the evidence

---

[6] Also relevant is that, in June 1999, shortly before LJM2 purchased the barges from Merrill Lynch, Merrill Lynch executives drafted a letter addressed to Enron demanding repayment with 15% interest for the barges, arguably implying that Enron had promised repayment within six months.  The letter was never sent, because LJM2 bought the barges before it could be sent out, but Brown was listed in the letter's "cc" field.

[7] Brown's attorney argued that Brown "was struggling with the meaning of the term 'promise' as used in a commercial context.  Not the way we would use it day to day, like, 'I promised you let's go to the movies.'  He tried to get across, in his mind, 'promise' suggests an obligation.  And that's not his understanding . . . ."

was insufficient for a reasonable jury to find Brown had lied, because Fastow's "promise" was not a legally enforceable commitment and thus was not a true promise.[8]

## III.

Brown now challenges his convictions on the ground that the government violated his right to due process by withholding materially favorable evidence that it possessed pre-trial. Brown focuses on three allegedly new pieces of evidence: (1) The FBI's notes of its interview with Fastow, (2) Senate investigators' notes of their interview with McMahon, and (3) transcripts of Zrike's pretrial testimony before the grand jury and the SEC.

The government disclosed pre-trial two letters that it says fairly summarized the exculpatory aspects of the Fastow and McMahon notes and the Zrike testimony. The government also showed the McMahon notes and the Zrike testimony to the district court *in camera* before Brown's trial, and the court did not find it necessary for the government to produce anything more than the summary letters. The government concedes that it did not submit the Fastow notes to the district court for *in camera* review.

Brown argues that there are significant differences between the Fastow and McMahon raw notes and the Zrike transcript, on the one hand, and the government letters purportedly summarizing them, on the other hand. The district court decided that the government did not violate its *Brady* obligation, hold-

---

[8] *See Brown I*, 459 F.3d at 525-31 ("Brown further argues that his testimony was not actually false, as he never denied knowledge of some 'understanding' or 'comfort' between Enron and Merrill Lynch as to the buyback; rather, he merely denied knowledge of a 'promise' of such a side-deal. This distinction and the spin placed on selective and hyper-technical word choice provides no refuge from the jury's verdict."); *id.* at 535-37 (DeMoss, J., concurring in part and dissenting in part) ("The questions posed by the Grand Jury related only to an enforceable take-out, not to an oral 'promise to pay us back no matter what.' . . . I conclude, therefore, that no reasonable jury could conclude that Brown's testimony before the Grand Jury was false.").

No. 10-20621

ing that the government did not suppress favorable evidence and that, even if it did, it was not material.

IV.

To establish a *Brady* violation, the defendant must prove that (1) the prosecution suppressed evidence, (2) it was favorable to the defendant, and (3) it was material.[9]  The good or bad faith of the prosecution in suppressing evidence is irrelevant.  *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (citing *Brady*, 373 U.S. at 87).  But evidence is not suppressed "'if the defendant knows or should know of the essential facts that would enable him to take advantage of it.'"  *Skilling*, 554 F.3d at 575 (quoting *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002)).  To have been suppressed, the evidence must not have been discoverable through the defendant's due diligence.[10]

Evidence is material if there is "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *United States v. Bagley*, 473 U.S. 667, 682 (1985) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).  In other words, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles*, 514 U.S. at 434.  A "reasonable probability" exists when the government's suppression of evidence "'undermines confidence in the outcome of the trial.'"  *Id.* (quoting *Bagley*, 473 U.S. at 678).  To prove a reasonable probability of a different result, the

---

[9] *United States v. Skilling*, 554 F.3d 529, 574 (2009) (citing *Mahler v. Kaylo*, 537 F.3d 494, 499-500 (5th Cir. 2008)), *vacated in part on other grounds*, 130 S. Ct. 2896 (2010).

[10] *See Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) ("To establish a *Brady v. Maryland* claim, [the defendant] must prove that the prosecution suppressed favorable, material evidence that was not discoverable through due diligence.").

No. 10-20621

"likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011) (citing *Washington*, 466 U.S. at 693). A "reasonable probability" is less than "'more likely than not,'" but the difference "is slight and matters 'only in the rarest case.'" *Id.* (quoting *Washington*, 466 U.S. at 693, 697).[11]

There is no difference between exculpatory and impeachment evidence for purposes of *Brady*. *Kyles*, 514 U.S. at 433 (citing *Bagley*, 473 U.S. 667). The suppressed evidence need not be admissible to be material under *Brady*; but it must, somehow, create a reasonable probability that the result of the proceeding would be different.[12] We assess the materiality of the suppressed evidence cumulatively, not item by item.[13] Once a *Brady* violation has been shown, there is no need for further harmless-error review, *id.* at 435, and a new trial is the prescribed remedy, not a matter of discretion.[14]

### A.

We generally review whether the government violated *Brady de novo*, *Skilling*, 554 F.3d at 578, although even when reviewing a *Brady* claim *de novo*, "we

---

[11] *Harrington* is an ineffective-assistance-of-counsel case, not a *Brady* case, but, under *Bagley*, the same "reasonable probability" standard that applies in ineffective-assistance-of-counsel cases applies in *Brady* cases as well. *See Bagley*, 473 U.S. at 682 (borrowing the *Washington* "reasonable probability" standard for use in *Brady* cases).

[12] *See Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir. 1999) ("'Inadmissible evidence may be material under *Brady*.' Thus, we ask only the general question whether the disclosure of the evidence would have created a reasonable probability that the result of the proceeding would have been different." (quoting *Spence v. Johnson*, 80 F.3d 989, 1005 n.14 (5th Cir. 1996))).

[13] *Skilling*, 554 F.3d at 590; *see Kyles*, 514 U.S. at 436 (requiring that the materiality of "suppressed evidence [be] considered collectively, not item-by-item").

[14] *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007); *see Kyles*, 514 U.S. at 435-36 (explaining that a conviction must be set aside if it is not harmless and that the *Brady* standard already incorporates a form of harmless-error review).

No. 10-20621

must proceed with deference to the factual findings underlying the district court's decision," *United States v. Sipe*, 388 F.3d 471, 479 (5th Cir. 2004). But we have an exception to our general rule of *de novo* review: Where, as is partially the case here, "a district court has reviewed potential *Brady* material *in camera* and ruled that the material was not discoverable, we review [that] decision only for clear error."[15] The district court's finding is clearly erroneous if, on the entire evidence, we are left with a "definite and firm conviction" that a mistake has been committed. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Thus, with respect to suppression and favorability—the first two prongs of the *Brady* test—we apply two different standards of review: Because the Fastow notes were never seen by the district court before trial, we review whether they are discoverable *de novo* (with deference to the district court's underlying factual findings). But because the court did review the McMahon notes and Zrike testimony pre-trial, we review its decision as to those items for clear error. And because we conclude that the withheld portions of the Fastow notes are not favorable to Brown, all favorable evidence was reviewed by the court *in camera* pre-trial. We therefore review materiality for clear error as well.[16]

B.

The first potential *Brady* item is the FBI's notes from its interview with Fastow, which were never disclosed to Brown, although the government did disclose a letter summarizing the notes. The issue is whether any evidence favorable to Brown in the Fastow notes was suppressed, in light of the government's

---

[15] *Skilling*, 554 F.3d at 578 (citing *United States v. Holley*, 23 F.3d 902, 914 (5th Cir. 1994).

[16] We have never addressed what standard of review applies in the case of a "mixed" *Brady* question, that is, where some withheld, favorable evidence was reviewed by the district court *in camera* pre-trial, but some was not. We need not address that question here, however, because all of the withheld, favorable evidence was reviewed pre-trial *in camera*.

disclosure letter.

Brown argues that the FBI's raw notes, unlike the government's disclosure letter, referenced a "best efforts" agreement, said that Fastow "never used the word promise," and contained assorted other, similar statements, such as "summary not consistent w/ [Fastow]'s memory b/c not word 'promise.'" The district court held that no favorable information from the notes was suppressed, because the disclosure letter did reveal that Fastow said that "Enron was the marketing agent, but could not make anyone buy at a specified time, price or return" and that "Fastow deliberately avoided the word 'guarantee' and knew that he could not give a verbal or written guarantee on the deal without jeopardizing the accounting treatment Enron needed."

We agree with the district court. Saying that Enron "could not make anyone buy" or that Fastow "deliberately avoided the word 'guarantee,'" knowing that he "could not give a verbal or written guarantee," conveys essentially the same information as "never used the word promise" or "obligation to use 'best efforts.'" Moreover, any potential exculpatory value of the passages from the Fastow notes that were not disclosed to the defense is eliminated when we read them in context rather than looking just to the portions of the sentences that Brown cherry-picks.

The notes say, to give only a few examples, (1) "It was [Enron's] obligation to use 'best efforts' to find 3rd party takeout + *went on to say there would be 3rd party b/c AF is manager of third party*," (emphasis added); (2) "LJM was 3rd party + was already found;" (3) "[Fastow] told [Merrill Lynch] that [Enron] would get [Merrill Lynch] out, would get [illegible] or LJM to buy out;" and (4) "Come June 2000, if [Enron] did not have a buyer then LJM would step in to buy out." Thus, the sentences that Brown cites from the Fastow notes do not say that the agreement as a whole was a "best efforts" agreement, *pace* Brown's testimony; they say only that *Enron* would use its "best efforts" to find a buyer but that Fas-

No. 10-20621

tow guaranteed that LJM2, which he controlled, would be that buyer if no one else was found.  Indeed, Fastow admitted that, "[i]f call was transcribed—it should have blown the accounting."

That is how this court interpreted the same statements in Fastow's notes in *Skilling*[17] in rejecting an essentially identical *Brady* claim.[18]  The relevant passages, read in full, thus corroborate the government's position, not Brown's, by showing that Fastow *did* promise a buyback by LJM2.  Thus, the government's disclosure letter accurately stated that "Fastow did not say Enron would buy back the barges, but represented instead that a third party would," and no favorable evidence was suppressed.

Second, Brown highlights a portion of the notes that says,

w/Subordinates

(1) Probably used a shorthand word like promise or guarantee as

(2) Internally at Enron.  AF, JM + BG would tell Enron people that there was a guarantee so to light a fire under Int'l people-so it should be in paperwork.

(3) On phone call, didn't say EN would buy back,—Rep of 3rd Party. Explicit.  Internally said Enron would buy back.  Unit less motivated if knew of LJM.  "Enron will take necessary steps to make sure you are out of this by June 30." → Reasonable for person on other end to think Enron.

---

[17] *See Skilling*, 554 F.3d at 589 (interpreting these precise passages to say that "it was not Enron itself that was formally bound to buy the interest from Merrill Lynch; LJM would do so if Enron's 'best efforts' did not result in another buyer").

[18] S*ee id.* (denying Skilling's *Brady* claim that the government concealed the "promise" and "best efforts" statements because the government's disclosure documents in that case "did not indicate that Enron was obligated," only that "Enron would not repurchase the barges, because LJM would instead").  *Skilling* is directly on point, because the defense in that case argued the same alleged deficiencies in the government's pre-trial disclosure as here. Moreover, that this is a perjury case and *Skilling* was a fraud case does not alter the analysis, because the defense argument is the same:  Fastow did not promise to buy back the barges.

No. 10-20621

The district court noted that those statements were "arguably . . . suppressed" but decided they were not material.  The information indicating that Fastow used different terminology with his employees than he did with Merrill Lynch was omitted from the government's disclosure letter, however, and was not otherwise available to Brown.  So it was suppressed.

But it was not favorable to Brown.  Read in context, Fastow's statements say only that Fastow was hiding *LJM*'s role in the barges transaction from his subordinates, not that there was no promise.  Fastow's promise to Merrill Lynch, as reflected in the notes, was that LJM would buy back the interest in the barges if a third-party buyer could not be found.  *Skilling*, 554 F.3d at 589.  Indeed, immediately preceding the passage that Brown cites, Fastow explained, "By referencing [that he was LJM's] General Partner [in the call with Merrill Lynch], was in effect giving the guarantee . . . .  [I]f LJM not buyer then [Enron] will take necessary steps to make sure [Merrill Lynch] not owner."[19]

Fastow then goes on to say, in the passage Brown cites, that he told subordinates that Enron would buy back the interest in the barges, because if he told them about LJM, they would lose motivation to find a third-party buyer.  That is the only possible explanation for his statement, "Internally said Enron would buy back. *Unit less motivated if knew of LJM.*" (Emphasis added.)  That Fastow told his subordinates that Enron would buy back so that they did not know LJM would do so supports, rather than undermines, the government's argument that Fastow made a promise that LJM would buy.  Indeed, we so held in *Skilling*, explicitly rejecting the notion that this portion of the notes implied that Fastow

---

[19] *See id.* at 590 ("Immediately preceding these notes, Fastow discussed the guarantee with Merrill Lynch extensively, repeatedly noting that he had made a guarantee in everything but name . . . .")

15

No. 10-20621

admitted to lying to subordinates that there was a promise.[20]

Brown's argument thus boils down to the proposition that we should consider the passages he cites to be exculpatory because he could have put some misleading spin on them to the jury. But because the only fair reading of those passages is an inculpatory one, the government is correct that no favorable evidence was suppressed.

C.

Brown claims the government withheld exculpatory portions of (1) the Senate Permanent Subcommittee on Investigations's notes from its interview with McMahon and (2) Zrike's grand jury and SEC testimony. Favorable information was plainly suppressed from McMahon's notes, and we will assume *arguendo* that favorable information from Zrike's testimony was suppressed as well. Nevertheless, the district court did not clearly err in holding that the suppressed information was not cumulatively material.[21]

The McMahon notes contain numerous passages that unequivocally state that it was McMahon's understanding that there was only a "best efforts" agreement and no "promise," whereas the government's disclosure letter says only that McMahon "does not recall" a guaranteed buyback. The district court thus clearly erred in holding that the government's disclosure letter fully disclosed the contents of the notes: "No" is not the same thing as "I do not recall." But despite the exculpatory nature of the suppressed portions of the McMahon notes, Brown could have made only very little use of them.

---

[20] *See id.* (holding, with respect to this identical passage, that it "does not contradict Fastow's assertions that he made an implicit guarantee to Merrill Lynch").

[21] Because we do not consider the materiality of any non-suppressed information, *id.* at 591, we consider only the cumulative materiality of the suppressed portions of the McMahon notes and Zrike testimony and not the materiality of the Fastow notes.

No. 10-20621

The parties stipulated that McMahon was unavailable as a witness because he would invoke his Fifth Amendment privileges if called to testify, so access to the McMahon notes would not have aided Brown in that sense. At most, Brown could have used McMahon's statements from the Senate subcommittee notes to impeach Glisan's and Kopper's testimony that McMahon told them there was a buyback "promise."[22] But McMahon's statements to Glisan and Kopper were merely cumulative evidence: Glisan and Kopper also gave unimpeached testimony that Fastow told them he promised Merrill Lynch that he would buy the barges back; Trinkle, Boyt, and Long all testified to the same effect; and multiple Enron and Merrill Lynch documents, including Brown's email, said there was a promise.

The "impeached testimony of a witness whose account is 'strongly corroborated by additional evidence supporting a guilty verdict . . . generally is not found to be material,'" *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) (quoting *Sipe*, 388 F.3d at 478), let alone on clear-error review and when the witness is an out-of-court declarant. Even if the net result of disclosing the McMahon notes to Brown would have been that the government would not have asked Glisan or Kopper to testify at all about what McMahon told them, that would have had essentially no impact on the government's case. Yet, it would have prevented Brown from making any use of the McMahon notes at trial, because they were otherwise inadmissible hearsay.[23] Thus, although the McMahon notes are favorable evidence, disclosing them to Brown pre-trial would not have cre-

---

[22] *See* FED. R. EVID. 806 (permitting a party to impeach a hearsay declarant's credibility by any means that would be allowed if the declarant testified as a witness, and stating that impeachment through the use of inconsistent statements is "not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain").

[23] Although evidence need not be admissible at trial to be material under *Brady*, it must somehow create a reasonable probability of a different trial outcome. *See Felder*, 180 F.3d at 212.

ated a reasonable probability of a different outcome, even in conjunction with the suppressed Zrike testimony.

Turning to Zrike's testimony to the grand jury and SEC, Brown points to her statements that Merrill Lynch wanted to add a best-efforts clause but was "not successful in negotiating that [in] with Vinson & Elkins [Enron's outside counsel]." Zrike explained that Merrill Lynch was "trying to be creative to protect [itself], but they [the Enron legal team] kept coming back to the fact that it really had to be a true passage of risk . . . ." She did not find it "nefarious [or] problematic" that Enron "would not put in writing an obligation to buy [the barges] back, to indemnify us[—]all those things were consistent with the business deal."

Those statements could have helped Brown by giving the defense an argument to counter the prosecution's position that the absence of a written "best efforts" agreement was evidence that there was no "best efforts" agreement at all. Brown could have pointed to Zrike's testimony to say that the reason the "best efforts" agreement was not in writing was that Enron's attorneys wanted a "true passage of risk." But that would have been of little marginal benefit to Brown, because Zrike already took the stand as a witness and gave testimony explaining that she believed the agreement was nothing more than a "best-efforts" agreement, and the prosecution successfully neutralized her testimony by arguing that she was unaware of Fastow's oral promise because Merrill Lynch's investment bankers kept her and the other lawyers out of the loop. Nothing in her allegedly suppressed testimony would have weakened the prosecution's successful argument on that point.

In sum, the favorable evidence that Brown points to is not, even cumulatively, sufficient to give us a "definite and firm conviction" that it establishes a substantial probability of a different outcome. There was considerable evidence of Brown's guilt. Trinkle testified that there was a promise during the

conference call she listened in on; Glisan and Kopper testified about Fastow's statements to them that he promised to rebuy; Boyt testified that Boyle told him, immediately after the Fastow call, that Fastow promised a buyback during the call; Long testified that there was a promise as well; Merrill Lynch conducted no due diligence, consistent with a buyback promise; a number of contemporaneous emails and documents referred to a promise; there was *in fact* a buyback, at 15% return, exactly six months after Merrill Lynch bought the barges, just as some internal documents said would happen; Fuhs jokingly emailed Brown that he would re-buy the barges only if Brown gave him a buyback guarantee; and in an email Brown himself said Enron had made a promise to buy back.

Brown points to the divided panel in *Brown I* to argue that the evidence against him was relatively weak. It is true that the panel was divided on Brown's guilt, but that division was over whether a legally unenforceable oral promise could establish Brown's guilt, not whether there was an oral promise at all.[24] The alleged *Brady* evidence in this appeal addresses only the latter issue—whether there truly was an oral promise to buy back or whether, instead, it was just a promise to use best efforts. It thus does not call the majority's holding in *Brown I* into question, and we have no authority to relitigate the issue that divided that panel. In short, the district court did not commit reversible error in holding that the *Brady* items, taken together, did not create a reasonable probability of a different outcome.

AFFIRMED.

---

[24] *See Brown I*, 459 F.3d at 535-37 (DeMoss, J, concurring in part and dissenting in part) ("The questions posed by the Grand Jury related only to an enforceable take-out, not to an oral 'promise to pay us back no matter what.'").