# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-50328

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

FRANCISCO ANTONIO COLORADO CESSA, also known as Pancho, also known as Francisco Antonio Colorado-Cessa,

      Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**
September 25, 2017

Lyle W. Cayce
Clerk

Appeals from the United States District Court
for the Western District of Texas

Before PRADO, HIGGINSON, and COSTA, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

We previously remanded this case to the district court to determine whether the Government suppressed certain favorable evidence and whether any of the suppressed evidence was material. *United States v. Cessa*, 861 F.3d 121, 143 (5th Cir. 2017) ("*Cessa II*"). On August 8, 2017, the district court concluded that none of the suppressed evidence was material. Because we cannot say that the district court's materiality determination was clear error, reversal is not required. We therefore affirm.

No. 16-50328

I

"The Zetas import drugs from Colombia and export them to the United States." *Cessa II*, 861 F.3d at 127. "The Zetas engaged in a money-laundering operation that involved purchasing quarter horses—a type of racehorse—in the United States. The scheme was designed to conceal illegal drug money by repeatedly buying and reselling horses to 'straw purchasers and shell companies'—a process that generated 'clean' money, the origin of which was difficult to trace." *Id.* Colorado was indicted as part of the scheme in 2012. *Id.*

Colorado's first trial began in April 2013. In the Government's opening argument, it told the jury that it would hear evidence that Colorado funneled money from the Zetas through his company, ADT Petro Services, and then back to the Zetas through racehorses. But even at that time, the Government possessed evidence that may have undercut its trial theory. Carlos Nayen, whom the Government described as the "money man" and "the man responsible for coordinating the purchase of horses" in the first trial, had been interviewed nine times as part of the investigation. At times, Nayen's statements indicated that Colorado may not have participated in the scheme. For example, Nayen told the Government that Colorado "only gave horses" to the Zetas "as a gift." The prosecutor's notes from the meeting indicate that Nayen said that Colorado gave the horses "out of fear." But the Government did not disclose Nayen's statements to the defense.

Nayen was not called to testify at the first trial. And the Government severely limited written documentation of Nayen's statements. The Assistant United States Attorneys prosecuting Colorado were present at seven of the nine interviews—all occurring between November 27, 2012 and February 12, 2013. At those seven interviews, only the prosecutors took notes. And three times, no one took notes at all. The Government did not create official interview memoranda, FBI Form 302s, until after Colorado was convicted in

2

his first trial. And within a month of Colorado's Rule 33 motion being denied, and nearly eight months after the first interview, FBI Agent Lawson began to create official interview memoranda for each of the meetings. Presumably working from prosecutor notes—and where there were no notes, from distant memory—Lawson generated 41 pages detailing Nayen's statements at the meetings that had occurred half a year earlier. This was not normal; the same agent, working on the same case, and dealing with the same witness quickly generated interview memoranda for the two meetings not attended by the prosecutors. Likewise, interviews of other witnesses throughout the investigation, including interviews by Lawson, were quickly memorialized into 302s. And for his interviews with other witnesses, Lawson noted his presence in the 302s, but for Nayen's interviews, Lawson failed to note that he was present.

After his first conviction, Colorado still did not get access to Nayen's statements. At his first sentencing hearing, however, the Government called Lawson to testify. During his testimony, Lawson referred to statements made by Nayen in the investigation—attributing them to a confidential informant. In response, Colorado asked to view the interview memoranda. But, when it appeared that the court might give the documents to the defense, the Government disclaimed any reliance on Nayen's testimony and asked that the documents not be turned over.

At that point it appeared that Nayen's statements would never be disclosed. But we reversed Colorado's first conviction because of an instructional error. *United States v. Cessa*, 785 F.3d 165, 170 (5th Cir. 2015) ("*Cessa I*"). And when the Government retried Colorado it decided to call Nayen to testify. Nonetheless, the Government did not disclose any of the 41 pages of Nayen's statements to the defense, disclosing instead, only the formal interview memoranda—and not the underlying notes—in camera, to the

district court.  Following Nayen's direct examination, the district court ruled that nothing contained in the 302s was favorable to the defense.  As we explained in *Cessa II*, the district court should have ordered disclosure because the 302s contained favorable exculpatory evidence.  *See Cessa II*, 861 F.3d at 129.  The Government compounded the error by saying nothing as Nayen testified inconsistently with the 302s during cross examination.  *Id.* at 131–34.  The jury convicted Colorado at his second trial.

Even after the second conviction, the Government opposed Colorado's effort to view the favorable statements in Nayen's 302s.  On appeal, Colorado argued that by failing to turn over the 302s, the Government violated its *Brady* obligations.  To make the argument, Colorado requested the 302s, although the defense recognized that a protective order or redactions may have been necessary to protect the Government's interests in the 302s.  Without explanation and without request for a protective order, the Government opposed.  We granted Colorado permission to view the 302s.

Finally with the benefit of the 302s, Colorado argued that the district court erred in finding that the documents were not favorable to him.  We agreed, and remanded to the district court to determine whether the information contained in the 302s was suppressed and material.  *Cessa II*, 861 F.3d at 143.  At the district court, the Government augmented its in-camera disclosure by providing the district court with the prosecutor notes corresponding to the 302s, as well as prosecutor notes from meetings with Nayen after the first trial (for which no 302s were made).  With respect to the prosecutor notes for which no 302s were made, the district court held that the notes constituted "non-discoverable, attorney work-product" under the Jencks

No. 16-50328

Act and declined to consider them.[1]  For the notes the district court did consider, it held that Nayen's statements in his interviews were not material under *Brady*, and therefore, Colorado's conviction could stand.

II

"To establish a *Brady* violation, a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016). "Evidence is material if there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "'A reasonable probability of a different result' is one in which the suppressed evidence 'undermines confidence in the outcome of the trial.'" *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). "Consequently, the issue before us here is legally simple but factually complex." *Id.* "We must examine the trial record, 'evaluat[e]' the withheld evidence 'in the context of the entire record,' and determine in light of that examination whether 'there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976); *Cone v. Bell*, 556 U.S. 449, 470 (2009)).

Because the district court reviewed the alleged *Brady* material in camera and determined that it was not discoverable, we review for clear error.  *Brown*,

---

[1] We nonetheless have reviewed the prosecutor notes for which no 302s were made, and we find no error in the Government's failure to disclose them to the defense.  We likewise have reviewed the additional notes found belatedly by the Government and given to defense counsel and the district court on September 6, 2017.  For these notes, too, we find no error in the Government's failure to disclose them earlier to the defense.

No. 16-50328

650 F.3d at 589. "The district court's finding is clearly erroneous if, on the entire evidence, we are left with a 'definite and firm conviction' that a mistake has been committed." *Id.* (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

III

As we explained in *Cessa II*, "Colorado's defense theory was that he bought horses for the Zetas using his own (or his company's) money. He explained that he spent millions of dollars on horses for the Zetas because he feared them." *Cessa II*, 861 F.3d at 129. Put differently, "Colorado argued that he did *not* join the conspiracy at all, claiming that he gave the Zetas gifts using his own money because he feared them." *Id.* at 130. Colorado argues that the *Brady* material contains three categories of evidence that would have materially advanced his defense theory, or at least impeached Nayen's testimony: (1) statements that Colorado feared the Zetas, (2) Nayen not disclosing payments flowing from the Zetas to Colorado and back to the Zetas until his seventh interview, and (3) a statement that Colorado gave horses to the Zetas as a gift. We hold that the district court did not clearly err when it found that none of the favorable statements were material.

First, the district court did not clearly err in concluding that Nayen's statements indicating that Colorado feared the Zetas were immaterial. In the interviews, Nayen describes a meeting between Colorado and Zeta 40 (the leader of the Zetas in Veracruz) in 2007. Some background is useful. In March 2007, Zeta 40 killed Zeta 14 (then the leader of the Zetas in Veracruz). After Zeta 14's death, Zeta 40 was put in charge of the Zeta's Veracruz operation. Soon thereafter, Zeta 40 called Colorado, Nayen, and Tavo—all friends of Zeta 14—to meet with him in Tampico. In the interviews, Nayen described the Tampico meeting. At the meeting, Colorado greeted Zeta 40, saying "hey friend." Zeta 40 responded that Colorado "was not his friend." Nayen

6

explained that after the meeting, Colorado was "in a constant state of anxiety" and that Zeta 40 "always wanted to kill" Colorado.  Colorado now claims that he could have used Nayen's statements to (1) directly show that he gave horses to the Zetas out of fear and (2) impeach Nayen's testimony that Colorado was friends with the Zetas.  The district court did not clearly err in rejecting the argument.

Nayen's trial testimony amply explained that Colorado feared Zeta 40 at the time of the Tampico meeting. *See Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) (cumulative *Brady* evidence is not material).  Nayen explained that he and Colorado fled from Mexico to the United States after Zeta 14 was killed.  However, Nayen testified that they were called back to meet with Zeta 40, and that they felt that they could not "say no" to the meeting.  Nayen explained that at the meeting, Colorado's business partner Tavo was killed, and that Nayen would have been killed had he attended because Zeta 40 did not trust Zeta 14's friends.  Finally, Nayen explained that prior to the Tampico meeting Zeta 40 was killing all of Zeta 14's friends.  Because Nayen extensively explained Colorado's reason to fear Zeta 40 at trial, the additional statements from the interviews were not material.  *See Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996) ("[W]hen the undisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs.").  Moreover, even if the statements had minimal substantive value, the Government put forward overwhelming evidence at trial that Colorado became friends with Zeta 40 sometime after the Tampico meeting.  *See id.* ("[W]hen the testimony of a witness who might have been impeached is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence is generally not found to be material." (quoting *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994)).  For example, Nayen testified that Zeta 40 and Colorado shared the head of the table at an event in 2008, Zeta 40 began giving Colorado money in 2009, and Zeta 40 gifted

Colorado a symbolic gun in 2011. Numerous other witnesses corroborated that Colorado and Zeta 40 appeared friendly after the Tampico meeting. Consequently, even accepting that the statements from the interviews would have allowed Colorado to show that he feared Zeta 40 in 2007, overwhelming evidence demonstrated that his fear subsequently dissipated as he and Zeta 40 became friends after 2007. And because Zeta 40 began giving Colorado money in 2009, the nature of their relationship after 2007 was far more important than the nature of their relationship as described in the favorable statements from the interviews.

Second, confronting Nayen with his failure to raise the cash deliveries until his seventh interview would not have been material because Colorado actually confronted Nayen about his failure to disclose the cash deliveries in his early interviews. *See United States v. Bernard*, 762 F.3d 467, 480 (5th Cir. 2014) (impeachment evidence not material where the witness was already impeached on the same issue). During cross examination Nayen admitted that he did not raise the cash deliveries during his first two interviews with the Government. And in closing, defense counsel impeached Nayen by noting that he failed to initially disclose the cash deliveries. Because Nayen was already forced to explain to the jury his failure to raise the cash deliveries early in his proffer, there would have been little, if any, additional value in showing that Nayen failed to raise the cash deliveries until his seventh interview especially because the Government put forward significant evidence that Colorado had received Zeta money and used that money to purchase horses for the Zetas.

Third, we see no clear error in the district court's finding that Nayen's statement that Colorado "only gave horses" to the Zetas "as a gift" was immaterial. The Government presented overwhelming evidence that Colorado bought horses for the Zetas using Zeta money. The gift comment, at best, ambiguously refutes the Government's allegation that Colorado used Zeta

money to purchase horses for the Zetas. In context, what Nayen said in the interviews is that Colorado would give horses to the Zetas and "say it is a gift." Nayen's statement explains how Colorado described the horses he gave to the Zetas, but it does not explain the provenance of the funds Colorado used to purchase the horses. And without that explanation, the gift statement would not been useful in refuting the Government's significant evidence that Colorado used Zeta money to buy horses. In any event, proving that Colorado used his own money to buy horses for the Zetas was not a significant issue at trial because Colorado could have been convicted of joining the money laundering conspiracy even if he used his own money. *Cessa I*, 785 F.3d at 182; *see also United States v. Sipe*, 388 F.3d 471, 490 (5th Cir 2004) (evidence more likely to be material if it goes to the "heart of the government's case"). Instead, the Government could prove that Colorado gave horses to the Zetas knowing that the purpose of doing so was to conceal the source or nature of illegal drug proceeds. *Cessa I*, 785 F.3d at 182. And the Government presented significant evidence that Colorado knew that the Zetas used his horse purchases to hide drug money; for example, the Government demonstrated that Colorado closely associated with the Zetas, knew the source of the Zetas' money, accepted money from members of the Zetas to care for horses held in Colorado's name, and paid for his horses in a surreptitious and suspicious manner.

Of course, we cannot examine the alleged *Brady* evidence in isolation; instead, "the question we must address is whether the 'cumulative effect of all such evidence suppressed by the government . . . raises a reasonable probability that its disclosure would have produced a different result.'" *Sipe*, 388 F.3d at 491 (quoting *Kyles*, 514 U.S. at 421–22). But even viewing the evidence cumulatively, we cannot say that the district court clearly erred in concluding that the suppressed evidence was not material. Accordingly, we

9

No. 16-50328

conclude that Colorado has failed to show a *Brady* violation, and we affirm his conviction.

IV

In *Cessa II*, we also declined to address Colorado's argument that there was insufficient evidence supporting the district court's forfeiture order and money judgment because both depended on a valid conviction. We now affirm both.

An individual convicted of money laundering under § 1956 must "forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1). A "statutorily-prescribed forfeiture is warranted upon a showing of a preponderance of the evidence." *United States v. Gasanova*, 332 F.3d 297, 301 (5th Cir. 2003). Property "involved in" an offense "includes the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and *any property used to facilitate the laundering offense*." *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997). "Facilitation occurs when the property makes the prohibited conduct 'less difficult or more or less free from obstruction or hindrance.'" *Id.* (quoting *United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990)).

The forfeiture order was supported by sufficient evidence. First, the Government demonstrated that the forfeited bank accounts were used to facilitate money laundering. The Government introduced extensive evidence demonstrating that Colorado comingled Zeta drug money in his otherwise legitimate accounts. And the Government demonstrated that the purpose of the comingling was to facilitate the money laundering offense. Second, the Government demonstrated that both the King Air aircraft and the Hawker aircraft were used to facilitate the money laundering scheme. Likewise, the money judgment was supported by sufficient evidence. The district court held

10

No. 16-50328

that Colorado was jointly and severally liable for the $60 million money judgment imposed on his co-conspirators after the first trial.  We agree that sufficient evidence supported the money judgment.  Accordingly, we affirm the forfeiture order and money judgment.

V

We have expressed concerns about the Government's handling of the *Brady* material in this case.  The "better course is to take care to disclose any evidence favorable to the defendant."  *Turner*, 137 S. Ct. at 1893 (quoting *Agurs*, 427 U.S. at 108).  When the Government fails to take this "better course," it risks that its convictions will be overturned.  *Berger v. United States*, 295 U.S. 78, 88–89 (1935).  And the damage is greater than any individual outcome because the Government is privileged to be "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."  *Id.* at 88.  The appearance of fairness is critical to a working justice system.  "Justice must not only be done; it must be seen to be done.  The interest of justice requires more than a proceeding that reaches an objectively accurate result; trial by ordeal might by sheer chance accomplish that.  It requires a proceeding that, by its obvious fairness, helps to justify itself."  *United States v. McDaniels*, 379 F. Supp. 1243, 1249 (E.D. La. 1974) (Rubin, J.).

We affirm.