# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 16, 2011

No. 10-30920

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

LANCE BENNETT; DALTON BENNETT, also known as D Bennett; DANQUELL MILLER, also known as Queezy Miller, also known as Quee Miller,

Defendants–Appellants

Appeals from the United States District Court
for the Eastern District of Louisiana

Before SMITH, PRADO, and ELROD, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Defendants Lance Bennett, Dalton Bennett, and Danquell Miller (collectively, "Defendants") were charged with conspiring to possess with intent to distribute 50 grams or more of cocaine base ("crack") and various other crimes in a nine-count indictment. During jury selection, the Government objected to Defendants' use of peremptory challenges, arguing that Defendants were striking white prospective jurors on the basis of their race. The district court agreed and placed two white jurors Defendants had previously struck back on the jury, displacing two other white jurors. Defendants were convicted and sentenced. They now appeal the district court's ruling on the Government's

No. 10-30920

objection during jury selection and various other aspects of their convictions and sentences.

## I.  BACKGROUND

### A.    Factual Background

Around 11:30 p.m. on February 19, 2008, New Orleans Police Department ("NOPD") Officers Chad Perez and Dean Moore were told by a confidential informant that defendant Dalton Bennett ("Dalton") had stowed crack inside the dashboard of a blue Nissan Titan truck parked at the corner of South Johnson and First Streets in New Orleans, Louisiana.  Perez and Moore knew from previous investigations that Dalton had prior arrests for narcotics and guns, and that Dalton's mother lived on that corner.  Perez and Moore approached the corner in their marked police car and observed two people exiting from Dalton's mother's house.  Perez and Moore recognized one of them as Dalton, who carried a suitcase to the truck and got into the driver's seat.  The other person—later identified as defendant Danquell Miller—got into the passenger's seat.

Dalton and Miller drove off from the corner, followed by Perez and Moore. Dalton exceeded the posted speed limit and failed to signal a turn, so Perez and Moore attempted to pull over the truck.  The truck did not stop immediately, and Perez observed Dalton and Miller moving around inside the truck.  After the truck eventually stopped, Perez and Moore asked Dalton and Miller to get out of the truck, and the officers noticed the pungent odor of lemon air freshener. Perez and Moore requested a K-9 unit, and NOPD Officer George Chenevert arrived about ten minutes later with Thomas, his drug dog.  Chenevert sought permission from Dalton to search the truck, which Dalton gave him.

Thomas immediately reacted to a smell in the truck and went straight for the dashboard.  Chenevert removed a panel on the dashboard to reveal a compartment that he knew existed in similar trucks.  In that compartment he found a .40 caliber handgun and a clear plastic bag containing what turned out

2

No. 10-30920

to be crack.  Dalton and Miller were detained after the crack and handgun were found.  A further search of the truck turned up a Hertz rental-car agreement in the name of Nicole Williams.  Dalton identified Williams as his girlfriend.  The police arrested Dalton, at which point they found $2,419 in his pockets.

Perez, Moore, Chenevert, Dalton, and Miller traveled to the apartment Dalton shared with Williams, who consented in writing to a search of the apartment.  The only fruit of that search was an additional $1,000 discovered in Williams's purse, which she said belonged to Dalton.  Miller was released outside Williams's apartment.

Dalton was processed and held at Orleans Parish Prison.  While he was intermittently imprisoned from February 20, 2008 through June 21, 2009, Dalton placed over 100 phone calls, and each was recorded.  Twenty-eight of those phone calls gave rise to the charges Defendants faced in this case, and were played at trial.  In one of the first calls, Dalton explained to Williams that he needed his brother, Lance Bennett ("Lance"), to "take this charge."  Dalton told Williams that Lance needed to sign an affidavit stating that he had paid Williams to borrow the truck for a couple of days, that the handgun and crack were his, and that Dalton was just bringing the truck back to Williams and dropping Miller off when the police stopped the truck.  Dalton then asked Williams to call Miller, so Miller could look up the number of Dalton's lawyer, Jason Williams ("Jason").  Minutes after that call, Dalton called Williams back to talk to Lance, who had just arrived at Williams's house.  Dalton asked Lance to "take this charge," explaining that Lance was "gonna get nothin' but provation [sic]," and that he would pay Lance's legal fees and bond.  Lance responded "I'm a do it."  Dalton then explained to Lance the story he had created about Lance borrowing the truck from Williams and instructed him to "go down there with Jason Williams and try to take this . . . before the feds accept it."

3

No. 10-30920

A few hours later, Dalton called Williams and Williams explained that Miller "gotta let Lance know what to say and all" to Jason. Williams said that Miller already "had to go sit down by your Mama house and talk to Lance." Dalton responded: "[T]hat's good he coachin' him." In a later call that same day, Dalton told Williams that it was important for Lance and Miller to hurry up and find Jason "so he can get this affidavit" signed before the case "go federal." Williams then initiated a three-way call with Miller and Dalton. Dalton told Miller to "make sure y'all try to collect Jason Williams bro, cause I need him to sign that affidavit ASAP right now!" Dalton told Miller to make sure that Lance knew "[w]hat color the thing was" and "how many grams": "Twenty-eight grams, eight grams and that black and silver thing."

Sometime between February 24, 2008, and March 19, 2008, Williams, Miller, Lance and Shelley Knockum (Lance's girlfriend) met with Jason, and Lance executed the false affidavit. The affidavit was signed by Jason and his secretary as witnesses, but Jason never had the affidavit notarized because he suspected the District Attorney's Office would not accept it.

A number of the phone calls played at trial concerned Dalton's attempts to continue to sell drugs both inside and outside Orleans Parish Prison. For example, Dalton called Williams and asked her to tell Miller that he had found a way to get marijuana into the jail, along with some pills. Dalton also spoke directly to Miller about getting an ounce of marijuana and some pills into the jail. Dalton also told Miller to work up to a "four spot" of crack—according to Williams, a bit more than four ounces—by the time Dalton got out of jail, and to get a job so the "alphabet boys" (federal agents) "wouldn't be as hot on him."

At the time Dalton was arrested, he was still on parole for two state charges. Dalton confessed to violating the conditions of his parole, and served a sentence for that violation until March 27, 2009, when he was released from jail. On June 18, 2009, a federal grand jury indicted Dalton for his possession

4

No. 10-30920

of the handgun and crack; he was arrested on a federal warrant on June 19, 2009 and returned to Orleans Parish Prison.

The same day he was arrested on the federal warrant, Dalton called Williams to arrange for her and Knockum to dig up his stash of crack from under two garbage cans in his mother's yard. He told Williams and Knockum that they would find about $2,200 worth of crack in 11 bags. He also told Williams that his cousin Shantay was going to give Williams 14 grams of crack, three of which she should give back to Shantay and the rest of which she should give to Miller. The next day, Dalton called Williams and asked her how everything was going. Williams said that Shantay had received the crack she was supposed to get, and so had Miller. In addition, she and Knockum had sold some of the crack they had dug up the night before, and Miller had told her that he would help her sell some of it. Williams testified at trial that she did give Miller some of the crack to sell.

## B.     Procedural Background

On October 30, 2009, the Government filed a superseding indictment[1] that charged Dalton, Lance, Miller, Williams, and Knockum with various crimes. They were all charged with conspiring to possess with intent to distribute fifty or more grams of crack and a quantity of marijuana in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), 841(b)(1)(D), and 846 ("Count One"). Dalton and Miller were charged with possessing with intent to distribute five grams or more of crack in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and 18 U.S.C. § 2 ("Count Two"). Dalton and Miller were also charged with possessing a firearm in furtherance of the drug trafficking crimes charged in Counts One and Two in violation of 18 U.S.C. §§ 2, 924(c)(1)(A), and 924(c)(2) ("Count Three"). Dalton

---

[1] The original indictment, filed on June 18, 2009, charged Dalton with possession and intent to distribute crack, possession of a firearm in furtherance of crack possession and distribution, and possession of a firearm by a felon.

was charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 2, 922(g), and 924(a)(2) ("Count Four"). Miller was also charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 2, 922(g), and 924(a)(2) ("Count Five"). Dalton, Lance, Miller and Williams were all charged with conspiring to obstruct, influence, or impede an official proceeding in violation of 18 U.S.C. §§ 1512(c)(2) and 1512(k) ("Count Six"). Lance and Knockum were charged with using a communication facility to facilitate a conspiracy to possess with intent to distribute crack in violation of 21 U.S.C. § 843(b) ("Count Seven"). Dalton, Williams and Knockum were charged with possessing with intent to distribute fifty grams or more of crack in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2 ("Count Eight"). Dalton, Williams and Knockum were also charged with using a communication facility to facilitate the conspiracy to possess with intent to distribute crack in violation of 21 U.S.C. § 843(b) ("Count Nine").

### 1.    *Pretrial Motions*

Dalton moved to suppress the handgun and drugs seized from the truck on February 20, 2008, arguing that: (1) the stop was pretextual because Perez and Moore never received a tip from a confidential informant, and they were following Dalton too closely for him to have committed any traffic violations; (2) the officers did not ask to search the truck upon stopping him and only called the K-9 Unit when their initial search of the truck turned up nothing; and (3) Perez and Moore confiscated $3,000 from Williams's purse when they searched her apartment, not the $1,000 they later claimed. The district court held an evidentiary hearing on January 27, 2010, at which Perez and Moore testified. On February 3, 2010, the district court denied Dalton's motion to suppress, determining that (1) Perez and Moore's version of events was more credible than Dalton's; (2)  probable cause existed to stop the truck based on the confidential informant's tip and Dalton's failure to abide by the traffic laws; (3) because the

No. 10-30920

car was properly stopped, Dalton—as an unauthorized driver of the rental truck—lacked standing to challenge the search; and (4) even if Dalton had standing to challenge the search, the police had probable cause to search the truck because of the confidential informant's tip, Dalton's failure to abide by the traffic laws, and the strong smell of lemon air freshener.

On March 25, 2010, after the district court had denied Dalton's motion to suppress, Dalton's attorney sent a letter to the Government stating that it had just come to his attention that Moore was the subject of a formal FBI investigation into allegations that he had lied to cover up possible police misconduct arising out of the death of a man in 2005. In April, Dalton's attorney subpoenaed documents from the NOPD's Public Integrity Bureau, seeking any complaints or investigative findings in Perez's and Moore's files.    The Government had already provided these materials to the district court to review and make available to the defense.

## 2.    *Jury Selection*

On June 1, 2010, jury selection began for the trial of Dalton, Lance and Miller.[2] After the parties exercised their for-cause and peremptory challenges, the district court asked if there were any objections to the jury selection process. At this point, the jury was made up of one Hispanic man, five white men, two black men, three white women, and one black woman. The Government said it had no objections. Lance's attorney raised a *Batson* objection to two of the Government's peremptory challenges. Of the six peremptory challenges allotted to the Government, two of them had been used on black prospective jurors; Defendants are all black. After hearing argument, the district court overruled the *Batson* challenge.

---

[2] Prior to trial, Williams and Knockum entered into plea agreements with the Government and both testified for the Government at trial.

No. 10-30920

Despite previously saying it had no objection to the jury selection process, the Government then raised a reverse-*Batson*, or *Georgia v. McCollum*, 505 U.S. 42 (1992), challenge to the Defendants' use of their peremptory challenges. Defendants had been allotted ten peremptory challenges and struck only white prospective jurors.  Each of the Defendants' peremptory challenges was then discussed.  During that colloquy, the Government pointed out that Defendants had been inconsistent in excusing prospective jurors for a particular reason, which they argued revealed that the reasons were pretext for discrimination. For example, the Government argued that Defendants claimed to have struck a prospective juror, Mr. K, because he had a drug addict in his family, but Defendants did not strike "several other [prospective jurors], including African-American jurors who said they had family members who were drug addicts . . . , so that can't possibly be a reason why they would cut them."  Or, as another example, the Government argued that "most of the reasons [Defendants gave] for cutting the people they cut is because they were associated with law enforcement," but Defendants had not struck a black prospective juror whose wife was a "former deputy."

The district court commented on a few of the Defendants' proffered reasons.  For example, Lance's attorney stated that he struck a prospective juror because, among other reasons, of his "relation to the military."  The district court responded: "The fact that they have military members in their family, how does that make them somehow unfavorable[?] . . . [S]omebody who's got relatives in the military shouldn't sit on a jury?  That's no reason."  The district court continued: "I find that if someone is subject to a peremptory challenge because of their family members in law enforcement, that's no reason at all."  After Defendants had proffered reasons for nine of their peremptory challenges, Miller's attorney stated:

8

No. 10-30920

> You know, Judge, the big part of our decision to deliberations [sic] was where the people live. There's a reason people go live over in Folsom and Bush, because they want to get away from the urban area of having black neighbors, and so we look at people as close to New Orleans like Westwego. When it came down to the lip log (sic), as a point of little information, you've got to make a choice. You can't just not make a choice. So the choices were made based on people who live where the John Burke Society [sic] is so popular over there in Covington, and Bush, and Sun and all those places.

When Dalton's attorney then stated that he struck the tenth prospective juror because she "lives in Covington," the district court responded: "No, [y]ou guys are too much, man. You guys are too much. Jeezum Petes. Give me a reason. Don't give me where they live. Give me a reason. They live in the Eastern District, okay." The district court then stated that Defendants had provided "some very, very flimsy reasons to strike all Caucasians . . . . [For] at least three or four of them you've given no good reason whatsoever, none." The district court explained that Defendants had not "made th[e] case [that a prospective juror from a conservative area of the state ought to be struck] for each and every person[,] . . . [and,] as [the government] pointed out, you've had th[at] same factor for African-American jurors and you haven't exercised a challenge." The district court concluded: "I mean, I don't think that you've been evenhanded at all in your peremptory challenges for at least three or four of these people." The district court turned its focus on three struck jurors: Mr. K, Ms. E, and Mr. B.

Lance's attorney's reasons for striking Mr. K were that his father was a drug addict and that he was a retired traffic engineer and "engineers tend to be not so good for criminal defendants." Miller's attorney added that Mr. K had previously served on several juries. And Dalton's attorney stated that he "thought [Mr. K] was a creole. If you look at him he's dark complexion. I didn't realize he's white." The Government argued that Defendants' reasons were pretextual because "[another juror's] got a family member who's a drug addict,

there are several African-Americans who indicated their family members were drug addicts." In the end, the district court determined that the defense's striking of Mr. K was not pretextual and kept him off the jury.

The defense's challenges to Mr. B and Ms. E, however, were overruled by the district court and they were put back on the jury, displacing two other white jurors. Lance's attorney stated that Mr. B was struck because "he was kind of uptight," "he didn't really say anything the whole time," "I didn't know what I was getting," and "He's in chemical sales and he's got two grown sons." Dalton's attorney said that Mr. B "worked in the oil fields." Miller's attorney added that Mr. B "just looked real conservative." The Government argued that those reasons were pretextual because a black male juror who was not struck by Defendants was a "tugboat captain." Lance's attorney argued that the tugboat captain was different from Mr. B because the tugboat captain was "blue collar," while Mr. B was "in sales."

With respect to Ms. E, Lance's attorney stated that she was objectionable because her husband was an engineer and "works at Shell." Lance's attorney later added that even though it was Ms. E, and not her husband, who would be sitting on the jury, "she's going to have to talk to him, Judge, and I know engineers." Dalton's attorney stated that he "voted for [Ms. E] because of where she lived in a very conservative parish. She's the mother of three daughters, three young daughters. She's a housewife, and her husband works for Shell Corporation. My instinct told me that she would not be a good juror."

The following colloquy then took place, during which the district court ruled in favor of the Government as to Mr. B and Ms. E:

THE COURT:    You all have yet to offer me a race neutral reason that is satisfactory in light of the fact that you've used all 10 challenges to excuse white jurors from the jury pool.

[LB's Attorney]:    Judge –

10

No. 10-30920

THE COURT:        The fact that her husband is an engineer is unconvincing and the fact that she lives in Covington is unconvincing.  That's part of the Eastern District.

[LB's Attorney]:   What about the fact that [Mr. B] is a white collar in the oil business in chemical sales?

THE COURT:        But that's his occupation.

[DB's Attorney]:   No, but, Judge, I think our point at one point is that –

[LB's Attorney]:   But he didn't say anything else, Judge.

[DB's Attorney]:   [Mr. B] –

[LB's Attorney]:   We don't have anything else to go on for him.

[DB's Attorney]:   [Mr. B] and [Ms. E] are worlds apart from being peers to our clients for Socioeconomic reasons.  It's important.  I mean, how do you want us to pick a jury?

THE COURT:        The law requires you—it's not how I want you to pick it.  It's what the law requires you to do with regard to peremptory challenges in exercising them in a race neutral fashion.

[DB's Attorney]:   And I'm trying to get a jury that reflects as closely as possible, you know, to their peers.  What they probably have is that all these people come from outlining [sic] parishes and there's no one here from New Orleans.  Our clients are entitled to a jury of their peers, and we're trying to affect [sic] that goal.  When you get a housewife that's got three young daughters that's of upper middle class in Covington, that's not very reflective.

THE COURT:        Is she not eligible for jury service?

[DB's Attorney]:   She's eligible for a peremptory challenge, I think for those reasons.

THE COURT:        You've got one. [Mr. B]'s from Houma, you know.  You complain about Covington.  You complain about other locations on the North Shore. [Mr. B]'s from Houma.

[DM's Attorney]:   Judge, whether they're from Houma or someplace else—we got down to the last couple of challenges and said, okay.  North Lake, let's get rid of them.

11

No. 10-30920

> It has nothing to do with the fact they're white, it's where they live.

> . . . .

[Government]:     First of all, that's an insult to everybody who lives north of the lake, okay. Second of all, if that were true, defense counsel then would have cut Number 18, . . . who's a black female who lives in Kentwood, Louisiana north of the lake and they did not.

. . . .

THE COURT:     . . . I think that to ascribe a particular reason to a particular person to live in a certain place doesn't always hold up in this case, so all I have left with is the fact that all ten of the defendants [sic] peremptory challenges were used on Caucasian are white prospective jurors, and I don't find that they were used evenly for the reasons that [the Government's attorney] just said. They have not been used evenhandedly for those reasons. We've had, as [] just pointed out, there's an African–American woman who lives on the north shore, who was not the subject of a challenge, and she lives in the same area, if not even further away, from some of these people that you've used challenges on. She lives in Kentwood. So I'm going to put these two people back on this jury.

The district court returned Mr. B and Ms. E to the jury, removing the last two seated jurors, who were both white. Thus, the sex and racial make-up of the jury remained the same as it was before the *Batson* and *McCollum* challenges: one Hispanic man, five white men, two black men, three white women, and one black woman.

12

## 3.    *Convictions and Sentencing*

After four days of testimony, the Government rested its case. At the close of the Government's case, the Defendants all made general motions to dismiss based on insufficiency of the evidence, which were denied. None of the Defendants presented a case. The jury reached a verdict later on the fourth day of the trial. Defendants were all convicted on Count One, conspiring to possess with intent to distribute 50 or more grams of crack and a quantity of marijuana. Dalton was convicted on Counts Two, Three, and Four, possessing with intent to distribute five grams or more of crack, possession of a firearm in furtherance of the crimes charged in Counts One and Two, and felon in possession of a firearm. Miller was acquitted on Counts Two and Five. Defendants were all convicted on Count Six, conspiring to obstruct an official proceeding. Lance was convicted on Count Seven, using a telephone to facilitate the conspiracy to sell crack. Finally, Dalton was convicted of Counts Eight and Nine, possession with intent to distribute 50 or more grams of crack and using a telephone to facilitate the possession with intent to distribute 50 or more grams of crack.

Before sentencing, Dalton filed a motion for a judgment of acquittal or new trial, arguing again that the handgun and crack should have been suppressed. Dalton cited testimony at trial that drew into question Perez's and Moore's testimony at the suppression hearing. Dalton also cited the federal indictment of Moore for his alleged involvement in the cover-up of a man's death in 2005. The district court denied Dalton's motion. The district court also denied a motion to continue Defendants' sentencings until after Sentencing Guidelines were issued pursuant to the Fair Sentencing Act of 2010 ("FSA").

Dalton was sentenced on September 15, 2010, to life imprisonment on Counts One, Two and Eight; 120 months on Count Four; 240 months on Count Six; and 96 months on Count Nine, all to be served concurrently. Dalton was also sentenced to 60 months on Count Three, to be served consecutively to the

No. 10-30920

other counts.   The district court determined that the FSA did not apply retroactively to Dalton's case, but that even if it did, the district court would have imposed the same sentence pursuant to the factors in 18 U.S.C. § 3553(a).

Lance was also sentenced on September 15, 2010.   The district court sentenced him to life imprisonment on Count One; 240 months on Count Six; and 96 months on Count Seven, all to be served concurrently.  Again, the district court determined that even if the FSA applied retroactively, Lance would have received the same sentence.

Miller was sentenced on September 29, 2010.  The district court sentenced Miller to 240 months on Count One and 210 months on Count Six.  All but 60 months of the term of imprisonment imposed on Count Six were to run concurrently with the sentence imposed on Count One, for a total of 300 months of imprisonment.   Again, the district court noted that even if the FSA applied retroactively, his sentence would have been the same.

## II.  DISCUSSION

Defendants all appeal the district court's determination that two of their peremptory challenges were improperly based on race.   In addition to that shared basis for appeal, Defendants challenge their convictions and sentences on various grounds specific to their individual cases.

### A.    Reverse-*Batson* Challenge

"[T]he Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges." *McCollum*, 505 at 59.  "[T]he prosecution has standing to assert the equal protection rights of excluded jurors."  *United States v. Bentley-Smith*, 2 F.3d 1368, 1372 (5th Cir. 1993).  Because *Batson v. Kentucky*, 476 U.S. 79 (1986), involved a defendant challenging the prosecution's use of peremptory challenges, the same type of challenge by the prosecution is called a "reverse-*Batson*" challenge.   Whether a criminal defendant or the prosecution challenges the

14

other's use of peremptory challenges, the same three-step analytical process is applied by the district court:

> First, the claimant must make a *prima facie* showing that the peremptory challenges have been exercised on the basis of race. Second, if this requisite showing has been made, the burden shifts to the party accused of discrimination to articulate race-neutral explanations for the peremptory challenges. Finally, the trial court must determine whether the claimant has carried his burden of proving purposeful discrimination.

*Bentley-Smith*, 2 F.3d at 1373 (citing *Batson*, 476 U.S. at 93–98; *McCollum*, 505 U.S. at 59).

### 1.    *Standard of Review*

"The district court's determination that a party has used peremptory strikes in a discriminatory manner is a finding of fact and thus cannot be overturned by this Court absent clear error." *Id.* at 1372 (citing *Hernandez v. New York*, 500 U.S. 352, 365–66 (1991)). A "district court's finding is clearly erroneous if, on the entire evidence, [this Court is] left with a definite and firm conviction that a mistake has been committed." *United States v. Brown*, 650 F.3d 581, 589 (5th Cir. 2011) (citation and internal quotation marks omitted). "The district court's determination is entitled to great deference, since findings in this context largely turn on an evaluation of the credibility or demeanor of the attorney who exercises the challenge." *Bentley-Smith*, 2 F.3d at 1373 (citing *Batson*, 476 US. at 98 n.21; *Hernandez*, 476 U.S. at 365).

### 2.    *"Majority Race" Exception*

As a preliminary matter, Dalton and Miller argue that the *Batson* line of cases ought not even apply here. Their argument is that discrimination in violation of the Equal Protection Clause is impossible where black defendants strike white prospective jurors who are replaced by other white prospective jurors, because no race is favored over any other race. Dalton further argues

that *Batson* should not apply to this case because a white prospective juror's right to serve on a jury is outweighed by the "superior fair trial right of a minority class defendant to use his allotted share of peremptory challenges not only to increase the chance of obtaining more members of his or her race on the jury but to also select freely among the majority members that necessarily will serve on his or her jury." Br. of Dalton Bennett at 18–19.

In *Batson*, the Supreme Court held that the "Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89. The *McCollum* Court extended *Batson*'s prohibition on racially motivated peremptory challenges to defendants, explaining that "*Batson* was designed to serve multiple ends, only one of which was to protect individual defendants from discrimination in the selection of jurors." 505 U.S. at 48 (citation and internal quotation marks omitted). *McCollum*'s extension of *Batson* was "designed to remedy the harm done to the dignity of persons and to the integrity of the courts." *Id.* (internal quotation marks omitted). *McCollum* vindicated the "dignity of persons" because "denying a person participation in jury service on account of his race unconstitutionally discriminates against the excluded juror." *Id. McCollum* also vindicated the "integrity of the courts" because "[j]ust as public confidence in criminal justice is undermined by a conviction in a trial where racial discrimination has occurred in jury selection, so is public confidence undermined where a defendant, assisted by racially discriminatory peremptory strikes, obtains an acquittal." *Id.* at 50.

Dalton and Miller correctly point out that *Batson* and *McCollum* both involved the use of peremptory strikes to exclude black jurors, and that neither

the Supreme Court[3] nor the Fifth Circuit has squarely held that *Batson* and its progeny prohibit a black defendant from striking a white prospective juror based on the juror's race. This court has, however, assumed without raising the issue that black defendants' attempts to remove white prospective jurors based on their race implicated *Batson* and *McCollum*. *See United States v. Dillard*, 354 F. App'x 852, 856–57 (5th Cir. 2009) (affirming district court's use of the three-step *Batson* analysis to determine whether black defendant who had used eight of nine peremptory challenges on white jurors had violated *Batson* and *McCollum*)*; United States v. Bailey*, 92 F. App'x 99, 99 (5th Cir. 2004) (affirming district court's conclusion that black defendant's use of peremptory challenge on white juror was discriminatory); *United States v. Duncan*, 191 F.3d 569, 574 (5th Cir. 1999) (same); *United States v. Kelley*, 140 F.3d 596, 606–07 (5th Cir. 1998) (same). Moreover, the Second Circuit has held that the "argument that *Batson* does not apply where an African American defendant seeks to eliminate white jurors is entirely without merit." *United States v. Thompson*, 528 F.3d 110, 118 (2d Cir. 2008).

Because the right to be free from discrimination is a right enjoyed by individual potential jurors, *McCollum*, 505 U.S. at 48, we reject Dalton and Miller's first argument that discrimination was impossible here, where white jurors were struck in favor of other white jurors. And because "[i]t is an affront to justice to argue that a fair trial includes the right to discriminate against a group of citizens based upon their race," *id.* at 57, we reject Dalton's second argument that black defendants should be able to use peremptory challenges in

---

[3] Justice Thomas, concurring in *McCollum*, stated his belief that this remained an open question: "Eventually, we will have to decide whether black defendants may strike white veniremen." *McCollum*, 505 U.S. at 62 (Thomas, J., concurring in the judgment). In a footnote immediately following that quotation, however, he wrote that while the issue was "technically" open, "it is difficult to see how the result could be different if the defendants here were black." *Id.* at 62 n.2 (Thomas, J., concurring).

a discriminatory fashion. We therefore hold that the Equal Protection Clause prohibits a black defendant from using a peremptory challenge to strike a white prospective juror because of that juror's race.

### 3.    *The District Court's Analysis*

Defendants argue that the district court did not properly apply *Batson*'s three-step process to evaluate the Government's reverse-*Batson* challenge. In particular, they argue that the district court improperly combined *Batson*'s second and third steps and required not merely race-neutral reasons for striking Ms. E and Mr. B, but minimally plausible reasons. *See Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) ("The second step of this process does not demand an explanation that is persuasive, or even plausible."). Relying on *United States v. Lance*, 853 F.2d 1177 (5th Cir. 1988), Defendants also argue that it was incorrect for the district court to base its finding of pretext solely upon Defendants' decision to strike jurors who were comparable to jurors they decided not to strike.

The Government argues in response that the district court properly applied the three-step *Batson* analysis and had good reason for determining that Defendants' "rambling, evolving reasons that would exclude much of the Eastern District of Louisiana" were pretextual. Br. of Appellee at 54. With respect to Defendants' argument that under *Lance*, pretext cannot be shown merely by pointing to characteristics shared by struck and non-struck jurors, the Government points to the following language from *Bentley-Smith*: "There will seldom be any evidence [of pretext] that the claimant can introduce—beyond arguing that the explanations are not believable or pointing out that similar claims can be made about non-excluded jurors who are not minorities." *Bentley-Smith*, 2 F.3d at 1373–74.

To be sure, the district court made comments that could be interpreted as betraying a misunderstanding of the minimal explanation required at the second

step of the *Batson* analysis.[4]  Notwithstanding those unfortunate comments, in light of our deferential review of fact and credibility determinations and based on our review of the voir dire transcript, we affirm the district court.  *See id.* at 1373 ("Although the defendants are able to parse out quotations from the district court that appear to support their argument, an examination of the whole transcript tells a different story.").  A fair reading of the transcript reveals that despite the district court continuously saying that it did not accept a particular reason offered by Defendants, the district court simply did not believe that the proffered reason was the Defendants' true reason for dismissing the juror.  *See id.* at 1375 ("[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based.").  Our reading of the record does not leave us with "a definite and firm conviction that a mistake has been committed."  *Brown*,  650 F.3d at 589.  Finally, we note that the district court's suspicion regarding Defendants' true reason for dismissing particular jurors was seemingly confirmed at oral argument, when Dalton's attorney stated, "Yes, we had a preference representing blacks, to get as many blacks as possible" on the jury.  Oral Argument Recording at 48:37, *available at* http://www.ca5.uscourts.gov/OralArgRecordings/10/10-30920_11-8-2011.wma. We therefore affirm the district court's determination that Defendants struck Mr. B and Ms. E for racially motivated reasons.[5]

---

[4] The reasons that the district court quickly rejected are unquestionably race-neutral explanations that satisfy step two of the *Batson* analysis, as we have recognized in prior decisions.  *See, e.g.*, *United States v. Williams*, 264 F.3d 561, 571 (5th Cir. 2001) (juror's demeanor and place of residence); *United States v. Kelley*, 140 F.3d 596, 606–07 (5th Cir. 1998) (occupation, family member's employment status, demeanor); *United States v. Pofahl*, 990 F.2d 1456, 1465–66 (5th Cir. 1993) (socioeconomic status, inattentiveness, and demeanor); *United States v. Mixon*, 977 F.2d 921, 923 (5th Cir. 1992) (occupation and prior jury experience).

[5] There is no merit to Dalton's argument, which was not raised below, that the district court erred in remedying the *McCollum* violation by placing Mr. B and Ms. E back on the jury

No. 10-30920

## B.     Defendants' Challenges to Their Convictions

### 1.     *Standard of Review*

"On appeal of a motion to suppress, the district court's findings of facts are reviewed for clear error, viewing the evidence in the light most favorable to the government. The district court's conclusions of law are reviewed *de novo*." *United States v. Hernandez*, 647 F.3d 216, 218 (5th Cir. 2011) (citation and internal quotation marks omitted).

We review de novo a district court's decision to deny a defendant's Federal Rule of Criminal Procedure 29 motion for acquittal. *United States v. Girod*, 646 F.3d 304, 313 (5th Cir. 2011). "The jury's verdict will be affirmed if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt." *Id.* (citation and internal quotation marks omitted). We do "not evaluate the weight of the evidence or the credibility of the witnesses, but view the evidence in the light most favorable to the verdict, drawing all reasonable inferences to support the verdict." *Id.*

A district court's decision to grant or deny a Federal Rule of Criminal Procedure 33 motion for a new trial is reviewed for abuse of discretion. *United States v. Piazza*, 647 F.3d 559, 564 (5th Cir. 2011). We are "necessarily deferential to the trial court because the appellate court has only read the record and, unlike the trial court, did not see the impact of witnesses on the jury or observe the demeanor of witnesses." *Id.* at 565 (citation and internal quotation marks omitted). Questions of law are reviewed de novo. *Id.* "For mixed

---

in the place of two other white jurors. The *Batson* Court left it to individual district courts to implement its holding, and suggested that "resum[ing] selection with the improperly challenged jurors reinstated on the venire" was among the appropriate remedies. *See Batson*, 476 U.S. at 99 n.24; *see also Jones v. Butler*, 864 F.2d 348, 370 (5th Cir. 1988) ("[A]ny prosecutorial misconduct is easily remedied before trial simply by seating the wrongfully struck venireman.").

questions of law and fact, we review the underlying facts for an abuse of discretion, but the conclusions to be drawn from those facts de novo." *Id.*

"*Brady*/*Giglio* claims raised in a motion for a new trial are reviewed de novo." *United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 1676 (2011). While review of the *Brady* question is de novo, we "must proceed with deference to the factual findings underlying the district court's decision." *Id.* (citation and internal quotation marks omitted).

## 2.   *Dalton's Motions for Acquittal or a New Trial*

Dalton first argues that the district court should have granted his motion to suppress, and therefore granted him a judgment of acquittal or a new trial, because Perez's and Williams's trial testimony "conclusively established that the [NOPD]'s version of the events surrounding the stop and searches [on February 19, 2008] w[as] rife with inconsistencies and simply cannot be trusted." Br. of Dalton Bennett at 30. The inconsistencies in testimony Dalton points to involve credibility determinations made by the district court during the suppression hearing or by the jury during trial.[6] Such inconsistencies are not "conclusive proof" that one version of events must be credited over another, and do not overcome our deferential standard of review of credibility determinations. *See United States v. Valentine*, 401 F.3d 609, 614 (5th Cir. 2005) (affirming the denial of a motion for acquittal based on an officer's inconsistent testimony at the suppression hearing and at trial because "[t]he district court was able to

---

[6] For example: Chenevert's testimony that there was a "pump spray bottle" in the truck causing the lemon air freshener scent versus Perez's testimony that he did not remember such a device; Perez's testimony that Williams gave consent to search her apartment versus Williams's testimony that Perez and Moore coerced her into signing the consent form; Perez's testimony that he and Moore were courteous with Williams's property during their search versus Williams's testimony that Perez and Moore ransacked her apartment; and Perez's testimony that he and Moore seized $1,000 from Williams the night of the search versus Williams's testimony that Dalton told her it was $3,000.

No. 10-30920

observe the demeanor of the witness at the suppression hearing and trial and thus was in a unique position to gauge credibility").

Dalton next argues that the district court should have granted his motion for acquittal because "it is now crystal clear that the government suppressed highly probative evidence of [Moore]'s history of writing false police reports and then lying about it to the FBI." Br. of Dalton Bennett at 32. Dalton claims that had "the defense known what the government knew at the time of the suppression hearing and at the time of the trial, the defense could have more aggressively impeached the already tainted credibility of government witnesses." *Id.* at 33–34.

"When a defendant seeks a new trial on the basis of a *Brady* violation, he must show that (1) the prosecution did not disclose the evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material." *Davis*, 609 F.3d at 696 (citation and internal quotation marks omitted). Evidence is "material" if, had it been disclosed, there is a reasonable probability the result would have been different—that is, a probability sufficient to undermine confidence in the outcome. *Id.*

Moore's subsequent indictment for lying to the FBI is not "material" because its disclosure would probably not have changed the result of Dalton's trial. First, at the time of Dalton's suppression hearing, Moore had not yet even made the false statement to the FBI for which he was later indicted. It is therefore unclear how Dalton could have used false statements that had not yet occurred to impeach Moore at the suppression hearing. Further, Perez corroborated Moore's testimony at the suppression hearing, and therefore it is likely that the district court would still have denied Dalton's motion to suppress. Moreover, because Moore did not testify at trial and likely would have exercised his right to avoid self-incrimination had he had been called to testify, the outcome of the trial would probably not have been different had Dalton and the

22

other Defendants known that the FBI was currently investigating Moore for filing false police reports. Thus, the district court did not err in denying Dalton's motion for acquittal or a new trial.

### 3.   *Lance's Motion for Acquittal or a New Trial*

Lance argues that there was insufficient evidence to convict him of conspiring to obstruct a federal proceeding. In particular, he argues that the Government failed to offer any evidence showing a nexus between Lance's agreement to sign the false affidavit taking responsibility for the handgun and crack in the truck and the federal charges brought against Dalton.

Under 18 U.S.C. § 1512(c)(2), it is a crime to "corruptly. . . obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so." The "official proceeding need not be pending or about to be instituted at the time of the offense." 18 U.S.C. § 1512(f)(1). The government must, however, prove beyond a reasonable doubt some "nexus" between the obstruction and the official proceeding. *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 707–08 (2005).

In a phone call the morning after Dalton was arrested, Dalton told Lance: "I need you to take this charge, bro. You ain't gonna get nothin' but provation [sic], bro. I'm a get Jason Williams for your lawyer, and I'm a bond you out and you gonna fight this shit on the street bro." Lance responded, "I'm a do it." Dalton then told Lance: "But, uh, man, y'all gotta go, y'all go, you got to find [Miller] and, and go down there with Jason Williams and try to take this, this bro, *before the feds accept it bro* cause, which you they ain't gonna fuck which you like that, bro." That phone call alone provided sufficient evidence for the jury to find a nexus between Lance's agreement to sign the affidavit and the "particular official proceeding" that affidavit would obstruct, influence, or impede. *See id.* at 708. The district court therefore did not abuse its discretion in denying Lance's motion for acquittal or a new trial.

### 4.   *Miller's Motions for Acquittal or a New Trial*

Miller first argues that there was insufficient evidence from which a reasonable jury could determine that he was guilty on Count One, conspiring to possess with intent to distribute 50 grams or more of crack.  The jury acquitted him on Counts Two, Three and Five, which charged Miller with possessing with intent to distribute the crack found in the truck, possessing the handgun found in the truck in furtherance of a drug trafficking crime, and being a felon in possession of a firearm.  Accordingly, he argues, the jury did not believe any testimony linking him to that crack and there was no other evidence of his involvement in his co-defendant's crack-selling conspiracy.

The elements of conspiracy with intent to distribute 50 grams or more of crack are: "(1) an agreement with one other person to possess with intent to distribute at least [50 grams of crack]; (2) defendant's knowledge of the agreement; and (3) defendant's voluntary participation in the conspiracy." *United States v. Percel*, 553 F.3d 903, 910 (5th Cir. 2008).  A conspiracy can be proven by circumstantial evidence.  *Id.*

The jury heard a phone call during which Dalton asked Miller "you got somethin' to keep yourself goin' huh?"  Miller responds, "Ye-, yeah."

DB:  Well then you good.  You, you like still able to do things?
DM:  Yeah.
DB:  Oh, you good then, man.  You know it's good when I come out there.
DM:  Right, I ain't trippin'
DB:  But still man, you should be tryin' to get to the four spot, man.  Just [UI] . . .
DM:  I already know, I'm . . .
DB:  Yeah . . .
DM:  Yeah.
DB:   . . . meet me halfway on some shit, yeah.
DM:  Yeah, you know I'm tryin' it.
DB:  Yeah, halfway and I give you the other half of it, ya heard me.
DM:  Yeah.

No. 10-30920

DB:   Yeah, man. 'Cause you know, Black . . .

DM:   Fuckin' right.

DB:   . . . gotta be like, yeah, by the time I get, y'all should be four
      strong man, on that.

DM:   Yeah, I know.

Williams testified that this conversation was about drugs, that Dalton was asking Miller whether he still had drugs to sell, and that Miller should work up to four and a half ounces of crack (about 127 grams) by the time Dalton gets out. From this conversation, a reasonable jury could infer that Dalton and Miller had an agreement to sell crack together, Miller knew about that agreement, and Miller voluntarily took part in that conspiracy. *See id.* Thus, the district court did not abuse its discretion in denying Miller's motion for acquittal or a new trial.

Miller next attacks his conviction for obstructing an official proceeding, arguing that it is impossible to know which official proceeding the jury had in mind when it convicted him.[7]  Miller's appeal on this issue lacks merit because in explaining the elements of obstructing an official proceeding, the district court specifically instructed the jury that "the trial of the United States versus Dalton Bennett, Lance Bennett, and Danquell Miller is an official federal proceeding and is a trial of a criminal case."

## C.    Defendants' Challenges to their Sentences

We review sentences for procedural error and substantive reasonableness. *See United States v. Scott*, 654 F.3d 552, 554–55 (5th Cir. 2011).  Procedural error includes "(1) failing to calculate (or improperly calculating) the applicable

---

[7] Because Miller did not raise this objection below, we review it for plain error. *See United States v. Breland*, 647 F.3d 284, 290 (5th Cir. 2011), *petition for cert. filed* (Oct. 14, 2011) (No. 11-6912).  Plain error requires: (1) error; (2) that is clear or obvious; (3) that affects substantial rights; and (4) if the elements are satisfied, the court of appeals may exercise its discretion to remedy the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Puckett v. United States*, 556 U.S. 129, ___, 129 S. Ct. 1423, 1429 (2009).

No. 10-30920

Guidelines range; (2) treating the Guidelines as mandatory; (3) failing to consider the 18 U.S.C. § 3553(a) factors; (4) determining a sentence based on clearly erroneous facts; or (5) failing to adequately explain the chosen sentence, including an explanation for any deviation from the Guidelines range." *Id.* at 555. Review at this first step of the district court's interpretation or application of the Sentencing Guidelines is de novo, and factual findings are reviewed for clear error. *Id.* If the district court's sentence is procedurally sound, we then consider whether the sentence is substantively reasonable, in light of the factors in § 3553(a). *Id.* "Appellate review for substantive reasonableness is highly deferential, because the sentencing court is in a better position to find facts and judge their import under the § 3553(a) factors with respect to a particular defendant." *Id.* (citation omitted). This Court applies an abuse-of-discretion standard of review. *Id.*

### 1.    *Lance's Sentence*

Lance first argues that the district court erred in not retroactively applying the Fair Sentencing Act of 2010 ("FSA") to his sentence. *See* Pub. L. No. 111-220, 124 Stat. 2372. The FSA increased the quantities of crack that triggered various mandatory minimum sentences. This argument is foreclosed by this court's decision in *United States v. Tickles*, 661 F.3d 212 (5th Cir. 2011), which held that "the penalties prescribed by the FSA do not apply to federal criminal sentencing for illegal conduct that preceded the FSA's enactment." *Id.* at 215; *see also United States v. Doggins*, 633 F.3d 379, 384 (5th Cir. 2011) (holding that the FSA does not apply retroactively to defendants who had already been sentenced and whose sentences were on appeal at the time the FSA was passed).

Lance also argues that his life sentence was substantively unreasonable, and constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. A review of Lance's sentencing hearing demonstrates that the

district court took the § 3553(a) factors into account in determining Lance's sentence. Moreover, because the FSA does not apply retroactively, the district court correctly sentenced Lance to a mandatory life sentence on Count One under 21 U.S.C. § 841(b)(1)(A)(iii). Finally, as to Lance's constitutional claim, "successful Eighth Amendment challenges to prison-term lengths will be rare," *United States v. Harris*, 566 F.3d 422, 436 (5th Cir. 2009) (citations omitted), and this court has previously upheld mandatory life sentences imposed under 21 U.S.C. § 841(b)(1)(A), *see, e.g.*, *Harris*, 566 F.3d at 436; *see also Rummel v. Estelle*, 445 U.S. 263, 272 (1980) ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare."). The district court therefore did not abuse its discretion in sentencing Lance to life imprisonment.

### 2.    *Miller's Sentence*

Miller argues that the district court abused its discretion in running 60 months of the 210-month sentence for his conviction on Count Six (obstructing an official proceeding) consecutively to the 240-month sentence he received for his conviction on Count One (conspiring to possess with intent to distribute crack). Under the Sentencing Guidelines, Miller's total offense level was 32, his criminal history category was IV, and the advisory Guideline range was 168 to 210 months. His conviction on Count One and the Government's filing of a 21 U.S.C. § 851 prior felony information, however, increased his mandatory sentence to 240 months. By imposing a 300-month sentence, the district court departed not only from the Guidelines, but also from Probation's recommendation of 240 months. A district court has discretion under 18 U.S.C. § 3584(b) to run sentences consecutively or concurrently in accordance with the § 3553(a) factors. During Miller's sentencing hearing, the district court stated that one of the reasons for his departure was that Miller's two co-defendants each received life sentences. We are satisfied upon reviewing Miller's sentencing

hearing that the district court took the § 3553(a) factors into account in determining his sentence. Moreover, avoiding unwarranted sentencing disparities among co-defendants is a valid sentencing consideration. *See United States v. McElwee*, 646 F.3d 328, 345 (5th Cir. 2011). Thus, Miller's sentence was not substantively unreasonable, and the district court did not abuse its discretion in running 60 months of Miller's sentence on Count Six consecutively to his 240-month sentence on Count One.

## III. CONCLUSION

For the foregoing reasons, Defendants' convictions and sentences are AFFIRMED.